The first case we'll hear today is No. 15-3931 C-Select Auto Sales v. BMW Bank of North America, and we'll hear from Mr. Bock. Good morning, Your Honor. My name is Phil Bock for Plaintiff City Select. May it please the Court, I'd like to reserve five minutes for rebuttal. That will be granted. Okay. Thank you, Your Honor. Plaintiff argues that two things. One is that the plaintiff satisfied ascertainability, that this circuit's ascertainability requirement in this case. And alternatively, if plaintiff didn't, then the Court should consider removing that hurdle, the class certification, because this sort of case is a case that is routinely certified in other circuits. Can I, maybe I could jump in here right now on the first issue. Yes, Your Honor. In any event, it seems to me you make a good argument as to why this case is not governed by Carrera. In Carrera, there was no evidence of retailer purchase records. There was no evidence that purchasers made with customer loyalty cards. There was no evidence that a single purchaser of one product could be identified by using records of customer membership cards. There was no evidence of record or records of online sales. And there was no evidence that the name plaintiff or any potential class member could even identify the product in question, let alone the number of times it was purchased. And there was no evidence of a model for screening claims that were specific to that kind of case. Now, you say that in this particular matter, there is sufficient data to start out with. And the only question, and I'm sure you will talk about the data and why that makes this a different kind of case factually. So the only question is whether the individuals actually received the faxes. And your position is, coupled with the data that you can interpret what is available, that it may be that affidavits may be sufficient. Because you know who it was sent to, at least 18,000 people, you've got those records. Right. You have fax numbers. There's no problem with giving notice to the class. People will, you've cut down the available universe of claimants in a way that where there is data to back that up. And that under those circumstances, affidavits or claims forms of various kinds might be able to provide that added thing in this case. And in Byrd, both in Carrera and in Byrd, we said that there has to be, there may be some individual determination, but not of the kind that might prevent this going forward as a class action. Yeah, that's right, Your Honor. The database here is the entire population. The judge found that the faxes were only sent to companies in the database. And the defendant... But the district court also made a finding that there was no evidence that the BMW fax was sent to every customer who had a fax number in the database during the relevant period. Yeah, that was, respectfully, that goes too far. There was only evidence that they only sent them to the people in the database. That they wouldn't have sent them, the hypothetical is maybe they sent this dealership seven of them and this dealership zero. But there's no reason to think that they did this. It was a program update right after the fax, when BMW, after the suit was filed, BMW reached out and said, what happened, the guy investigated, talked to this current employee, Gomez, Sean Ryan, the CEO. It's a small company. And he emails BMW and says the guy sent it to, quote, our registered dealer list. Isn't the receipt of the fax more important than whether they were sent? Well, for this case it doesn't matter because receipt is the number we're talking about. 21,000 is received because Westfax only charges for successfuls. How are the potential class members going to remember that they actually received one of these faxes? Well, some of them, if they needed to remember, if we got to that point, if there was money to distribute and the parties and the court come up with a method for distributing money, it is possible that some of these people remember them. It's also possible that these businesses still have copies of them. So you say at this stage your case is made by reference to a log of faxes that were sent? It's not a fax. It's not a log in terms of a transmission report that shows this particular number got a fax at this particular time. But we know that the database is currently 18,000, around 18,000 car dealerships. After removing ones that had gone out of business, and the database is a year and a half after the faxing, so it makes sense that 21,000, less a few thousand out of business, and that's what we have left. How do we know even that? And we're talking about a single-page fax that was sent four years ago, and we said in Carrera that if there's reason to be dubious of the memory of people, that all the more important that the corroboration, the documentary proof, be reliable. So that focuses us back on what is the database that you're pointing us to, and how do we get over the hurdle of we need to find clear error, right, for the district court's fact-finding that there's no evidence that these were sent. Now you're referring to the 18,000 as equivalence and seem to rely on that fairly heavily. But don't we have a problem here? This is your burden of proof on ascertainability, right? And you opted not to, pre-mediation, file a motion to compel for the database, and it was denied later in part because of that delay in your commitment ahead of time not to make that request. Without the actual database, how do we even know whether those who were created in or before 2012 are 2,000 or 5,000 or 10,000 or 18,000? Well, there hasn't been a requirement to date that you have to start a class action with a perfect class list, or that you have to have one before you move for class certification. We don't need perfection, but if you're relying on affidavits, we need some kind of documentary corroboration. The pure say-so of the affidavit's not enough. And if you're relying on that database, you didn't seek that database in a timely way, and we know very little about it, even whether it reflects only a few of folks who were entered in 2012. Well, we didn't move to compel it right away. We did ask for it with our first set of discovery requests. We asked for the class list, and they told us no. And it's proprietary, and they won't produce it even if there's a protective order, that sort of thing. So we didn't push it because we didn't need the class list to argue. And there was depositions. It's not only affidavits. It's depositions, plus it's the e-mails between these people, between the BMW defendants and Credit Smarts, and it's the e-mails where Credit Smarts is telling BMW what their internal investigation has revealed in this small one-room, basically 1,000-square-foot office with temporary employees. The guy got to the bottom of it. We sent it to the registered dealer list. Why do we have to have the registered dealer list in order to look through and see who's on there today, to know that this is the class? The class is in there. We can notify all of those people, and they can all be told exactly what we know and what we don't know, and that we're going to ask them later. We're going to ask them later, do you have a copy? If you have a copy, get your phone bills. Ask around at the office. It could be worth $500. It's going to be important. See if you can find it. But we know that we're going to be able to send notice to everybody. We're not talking publication notice. We're talking about direct mail notice to 18,000 companies. Once you say it's $500, you're going to get a lot of responses probably. In Carrera, which was just mentioned by Judge Sirica, as in this case, the concern appears to be fraudulent or inaccurate claims. So what is your best pitch for addressing those concerns? Well, for one thing, it's not the concern that's present if it's just a consumer product. Nobody knows who bought them, and you just ask everybody, and people in jail say, I bought 12 bottles of that. Send me a check. These are people in a database. They're going to be sent direct notice, and they can verify whether or not they're a car dealership and they had a fax number. The concern for fraud isn't here because we know the population. I guess the question is whether there's a person in the class who says, yeah, I got one of those, and really he didn't get one for some reason. Some other dealership got two of them. That is a concern. The concern, then, is the ascertainability factor. Fraud is a concern, isn't it? I guess fraud is always a concern. Somebody could sit there and testify, and they could be lying. I mean, it's all going to be subject to some kind of credibility, but this person is going to either be in the database or not. They're either going to have it or not. They're going to have phone records. They're going to remember it. But the point is, wouldn't a class member rather share his money with the other car dealership down the street than nobody gets anything? There's no other case. The statute of limitations is run. I missed a number you gave before. How big is a potential class? Well, there's almost 21,000 faxes. There's 18,000 remaining in this database. So that's who we would notify. But to clarify, if you had the opportunity on remand, you would seek the database, right? For purposes of notice, yes. And the class definition, then, do I understand it correctly that the way you define the class, it only includes those who were in the database, that is, had it created on date in or before 2012. So you wouldn't be sending notice to the entire 18,000. You would be sending it to whatever subset was in or created in or before 2012. And then if I got you correct, you would seek affidavits from all of those who responded to your notice? Well, that's something we could do if the case is resolved favorably and people, if there's some reason. Oh, I see. Whoever responds, you would consider a member of the class. Well, right now what we would do is we would just notify everybody. Rule 23 requires we notify the class members, we tell them what's going on, tell them they're going to be bound, tell them they can come and help with a lawyer if they want to, they can opt out. But this is going to resolve this controversy right now. And the defendant's going to get a good race judicata binding finality. So receipt is not an issue from your standpoint? Not for purposes of class certification. I mean, an interesting aside is that the statute prohibits the sending of an unsolicited facsimile. If I send, Your Honor, one, and your machine's out of paper and I just keep sending and sending, it keeps ringing and ringing and ringing, that violates the law even if you never received it. But here we're able to focus on how many of these things were actually received, but for the fact that the defendant's credit smarts doesn't have the records, didn't keep them or destroyed them. Westfax is set up in a way so that everything is gone and destroyed. And it really creates the only and the best defense to a class action is just to not have any records and then say, gee, we can never get to the bottom of this in this case. But this case is as close as you can get to perfect, you know. And back on to the class. Mr. Buck, I think we'll hear from you. I'm sorry. Thank you. Thank you. Mr. Hayes. Good morning, Your Honors. My name is William Hayes. I represent Credit Smarts. And as an aside, since Westfax, the fax broadcaster's existence, I've also represented them. So I'm thoroughly familiar with Westfax's practices. I had a prepared speech. But what I really want to underscore for the judges here is what has been picked up just recently, is that a loan employee at Credit Smarts sent these faxes when Mr. Ryan, the owner, wasn't even present. And no one else has any other knowledge of what happened, who created the fax, who it was sent to, how it was sent. Mr. Gomez testified that he didn't recall who he sent it to or whether he even used the database. That's not really disputed, is it? It's not disputed that these faxes were sent. You're suggesting that you had no knowledge and, therefore, you have no responsibility? No, sir. No, Mr. Gomez is an employee of Credit Smarts, and Credit Smarts accepts responsibility for its employees' actions. What I'm saying is that Mr. Gomez is the sole person who had any involvement in sending the order to Westfax and having it broadcast. But what about the Credit Smarts' own CEO in the e-mail that your colleague referred to a moment ago, reports that Mr. Gomez told him contemporaneously that this was sent to the entire registered database? He didn't say that, Your Honor. Six months after the fact, BMW sent an e-mail to Mr. Ryan saying, what is this, after the lawsuit was filed? Mr. Ryan was shocked, and he asked Mr. Gomez what happened. The phrase registered dealer database is just a generic term that Credit Smarts uses. It doesn't refer to any item in the database itself. It doesn't identify anybody. It was just a shorthand way of Mr. Ryan saying what he thought happened. He wasn't testifying or trying to be coy at the point. He was just trying to clearly communicate to BMW what had happened. What do we do when we combine that with the testimony of Mr. Ryan that Mr. Gomez told him that the fax was a program update? Gomez is in acknowledgment that it appeared to be a program update. And Mr. Ryan's testimony, when asked to explain what a program update was, that that was something that would provide them, that is, the list of 31,000 auto dealerships that have registered to receive information with information that they would need. When we take these various pieces of evidence and what on its face seems like a substantial equivalence in terms of the numbers, albeit off by a few thousand, but 21,000 to 18,000, why doesn't that at least get over the preponderance of the evidence standard? That's all that's required, right? That is the requirement, Your Honor. What happened here is there's two pieces. Mr. Ryan testified what he believed based upon what Mr. Gomez told him. But it was all speculation on Mr. Ryan's part. There's no place where he could look or verify anything that happened. In truth, Mr. Gomez created the fax. It was a program update, which you can see on the face of the fax, which Mr. Ryan subsequently looked at. And there simply is no evidence of who the faxes were sent to. Records weren't destroyed. They simply weren't kept. And the district court specifically found that. But from this you can draw a reasonable inference. And doesn't that distinguish this from Carrera or Hayes where it was clear on the face of it that there were multiple alternatives of reasons that someone would be in a particular database, where there would be in a particular list. Here you haven't offered anything as an alternative. And it's not shifting the burden in the sense of there being an absence of evidence and you having to prove something. It's that in the face of these other pieces of evidence, there's no rebuttal that's been offered. Well, Your Honor, there is no evidence. And there isn't any rebuttal evidence. There's argument by plaintiff's counsel that there is evidence. But there isn't a database. There isn't a button or a field in the database that tells you who the faxes were sent to. There isn't any testimony that the database was the sole source of who the recipients might have been. Well, isn't that a function of discovery? I mean, shouldn't they have the opportunity at least to demand certain documents that they believe exist? They could have. They didn't ask for it. Well, I think your opponent said that he did ask for it and it was refused. That's not correct, Your Honor. Not correct that he asked or not correct that you refused? The database was not specifically requested. And when it was requested, we pointed out that, again, through no fault or destruction, the 2012 database was destroyed. And so we preserved. That makes it a little too easy, it seems to me. With a document that is so important to identify potential class members, that document is destroyed. There are independent, innocent reasons for that on the record that the district court took into account. Are you representing the 2014 database has been destroyed? No, no, no. The 2012 database when requested was not in existence. The preserved 2014 database exists. Well, maybe they should have that. I mean, I understand the request is give me that document and maybe I can reconstruct who received the faxes on that basis. Absolutely. And we gave it to the district court and the district court looked at it and specifically found that they could not reconstruct who received the faxes. Not anybody. Just to be clear, because you said that I heard you say it wasn't requested and that it was destroyed. There was a request both before and after mediation for the 2014 database. Yes, Your Honor, and it was provided to the court. And did the district court misapprehend or have a certain interpretation of the ascertainability requirement that may have guided his view that the 2014 database could not be used in this case? The district court said in its order that even using the 2014 database as preserved, they could not identify who the fax recipients were. There's no field or button or anything in that database that would indicate who the faxes were sent to. In plaintiff's class, there are three different fax broadcasts that they include in the class. One was sent to 5,000. Some was sent to 9,000. There's no correlation between the fax broadcasts and the recipients of the faxes. The district court made a finding, quote, there's no evidence that the BMW fax was sent to every customer who had a fax number in the database during the relevant time period. That's correct. We've heard today about some of the evidence that is in the record that suggests that that may have been the case. Whether you think it crosses the threshold or not is a different question. But there is, in fact, some evidence that the fax was sent to every customer in those emails and in the testimony. The emails don't provide any evidence as to who the recipients of the faxes were. There were a couple of emails six months later where Mr. Ryan was trying to communicate to BMW what happened. It's not evidence of who was sent anything. There's no identity of any recipients. It was just a general indication, conclusion as to how this even occurred. Is that finding, that characterization of the evidence, what you were referring to in saying that the district court evaluated the list and made a determination from that list that they couldn't ascertain who the faxes were sent to in 2012? Again, Your Honor, there was no list even reviewed to ascertain. There is no list. There is no record. They then jumped over to a preserved database and tried to look at the database to see if there was any indication for them to any mechanism where they might identify who got the faxes. And the district court found there wasn't anything. Was that database turned over to the class or was it just a matter that the district court looked at and said, no, you're not going to get anything out of this? That's what the district court said. The determination that you were describing a few minutes ago by the district court, was that the quote that I just read or is there some other? That was the beginning of the quote. That was the beginning of the quote, Your Honor, and if you'll allow me, I can give you the balance of the quote. The balance of the quote says, Your Honor, after carefully considering the Third Circuit cases, the court cannot conclude that plaintiff has met a burden of demonstrating that the class is ascertainable. It says that found that the database does not reveal the customers to whom the fax ad was sent to. I'm curious about that decision. What does the log reveal? Does it reveal numbers or phone numbers to which the faxes were sent? There is no log. There is no indication of who the faxes were sent. It's very difficult to prove a negative, but in spite of what plaintiff's counsel says, there isn't anything. There isn't a log. There isn't a list. There's no dispute that database contains a list of dealerships, right? It's not exclusively a list of dealerships. There are other members in the database. It also includes, but it does include dealerships. Yes, ma'am. And it also has a created by field so that you can ascertain when that entry was put into the database. No, not in all cases, Your Honor. Sometimes it shows a date, but it doesn't say created on such and such date. What was the purpose of your document? Which document are you referring to, sir? The one we're talking about. The fax itself? Yes. Well, that was the other ironic thing in testimony. It served no purpose. It wasn't consistent with the advertising Credit Smarts even did. The employee and Sean Ryan just shook their head. They don't even know why it was sent. So is it the case that a log did at one time exist, but it's no longer available? It was apparently destroyed? A database existed. Mr. Gomez testified that he may have used the database to call some numbers from it to send the fax ads. He didn't remember when he did it or how he did it, and no one else was around. He said no one else was aware of it. When that occurs, it seems to me that the ascertainability standard should be relaxed a whole lot because what was there and available to determine who got the faxes no longer exists because it was in the hands of the senator. I agree with you, Your Honor. And in your court, it is said that, yes, we should be sensitive to that, but it doesn't change the standard. Your courts have said that, I think it was in Walmart, they said that where that's the case, it's unfortunate, but it still doesn't change the standard. I've been doing this for many, many, many years, and you see all types of facts and circumstances. In this case, there simply isn't a record. There simply isn't a log. There isn't a database. There isn't anything to identify who the recipients were. The court acknowledged that, and I think under any standard, relaxed or otherwise, you're not going to ever be able to identify any of these recipients, and it is, in my mind, improper to certify now and decertify later. If you don't know now, you're not going to know later. Well, that happens, though. Courts will do that, and properly so, and decertify later if that's an appropriate consideration. But aren't you coming pretty close to saying that for most of the violations of the TCPA, there's going to be no remedy, at least on a class-wide basis? I don't believe so, sir. There are thousands of TCPA class action cases filed annually, and there is a remedy. There's just some minimal requirements that are required for Rule 23 in order to have an orderly and administratively feasible way of proceeding. I worry about what Judge Sirica is pointing to, and I worry about the idea if we were to – the facts of this case would suggest to others down the road, you know, you better get rid of those documents and get rid of those logs because it will insulate you from class action since there's no evidence that a litigant can use. So I worry about what we would be saying to future litigants under this statute and other cases like it. Well, the statute doesn't require any particular record keeping, and certainly when these records were not kept, there wasn't any intent to spoil evidence or destroy evidence, and the district court found that. In some cases, the information simply isn't there, and this is one of these cases, and it was purely innocent. There was nothing to indicate that there was any abnormalities going on here. Is innocence filled into the statutory obligation? No, sir. We've said that it doesn't change the plaintiff's burden where the documents aren't available in the absence of a statutory requirement. Here, the statute, or the regulations in any event, are not entirely silent. There is a suggestion that, at least as to permission, that records be maintained. Where we have that, and we don't have simply the absence of records, but what appears to be a meticulous policy of immediately deleting the database on both sides of the transmission as soon as it's sent, perhaps in the shadow of the TCPA, why shouldn't we, in that circumstance, draw an adverse influence? Two reasons, Your Honor. First of all, records weren't instantly destroyed in that type of situation. As it turns out, in this particular case, the facts that was prepared by an employee, he didn't keep any records of that. It didn't violate any particular policy. There was no intent involved. And second, the TCPA, when the drafters drafted that, the FCC subsequently suggested that it would be a good idea, but not a requirement, specifically said that, that the sender keep records of who the recipients were in case it later had to verify that they gave consent. So the obligation is not to keep. The FCC say that it might be a good idea to do that in case you had to subsequently show consent. Is that language, it's a good idea? Was that the language in the? The FCC's regulations, it said not good idea. I think it said it was suggested, something to that effect. If you'd like, I can pull that language and provide it to you. But it's in the FCC's rules and regulations. The record before us, as I understand it in the briefing, indicates that the practice was that as soon as the transmission and the list of recipients had been uploaded, and once it was sent, it was deleted on both sides of the equation, coming from BMW and on the recipient side for your client. Are you saying that that evidence in the record is contradicted by something else? And if so, can you point us to that in the record? I don't see anything in the record or any testimony that said that the fax transmissions that came from Credit Smarts, not BMW. BMW had no prior knowledge of any of this. They had no participation authorization, nothing. But there's nothing in the record that I'm aware of that Credit Smarts deleted records or didn't keep track of these records. Several months after this case started and a year after discovery was commenced to get these records, they simply didn't have them. They didn't maintain them. The idea of the employee keeping that record of an order he sent to Westfax for a fax transmission, he didn't think about the importance of keeping that. There's no policy or any intent here or any general practice. Okay. We'll hear from a colleague. Thank you. Thank you. Ms. Strickland. Good morning. Julia Strickland on behalf of BMW. Let me start by trying to address some of the questions that the court has raised. But even before I go there, let me start with the standard here, which Judge Krause pointed out, but I just want to make clear. It's abusive discretion. The evidence was before the trial court, and the trial court made factual findings on the record before it, including that the plaintiff here provided no method for determining which of the So Mr. Bach stood before the court and, I guess, extemporized as to what a potential method for identifying customers would be. That wasn't actually in the record, and it wasn't before the court. And the court there concluded no such proposal was made. The court also concluded on the record before it that the Credit Smarts database does not reveal those customers to whom the BMW fax was sent. What does it reveal? I have to defer, frankly, to Credit Smarts counsel. But my understanding on the exact content, but my understanding is the following, is that there was a database in 2012 at the time these various faxes were sent. That database was updated as time went on, as is very often the case. Two years later, the lawsuit gets filed. You now have a different database, which potentially has some customers from 2012. I'm sorry, some dealerships from 2012, some from 2014. There's not a perfect indicator as to which ones were in the database in 2012 and which were in 2014. That's the one that the district court had that it said would be useless for the litigants. The court made findings with respect to whether the database was of any utility. I also want to make a point here, which is this is... But it does, that database does include the numbers of the recipients of the faxes. It includes lots of things. A subset of that database that can't be identified from the database is some members of the group who received the faxes. So it includes lots of things. But isn't it significant that they have, by the plain language of their definition, they've limited its terms to those who appear in the 2014 database that were created or were entered as of 2012? So if someone's in the database and it doesn't reflect that they were there in 2012, they're not even a member of the class by the terms of the class definition. But the court concluded, based on the evidence before it, that you can't identify those people from the database. That was a finding of fact before the court. But when we're reviewing for abuse of discretion, that includes looking at clear error as to facts in which the district court may have based its legal determination. And where we have evidence in the record, including albeit circumstantial, but when you look at the e-mails, the statements that were made, the idea that these are program updates, that program updates are something that is sent to the entire database. Why don't we put that together along with the apparent similarity in the numbers to say that at least there is some evidence. The district court's conclusion that there was no evidence that gives rise to an inference that the database can identify those to whom the facts were sent in 2012, that that's just erroneous fact finding. Well, Your Honor, there's a fair amount of evidence that there is not a conclusive way to determine who those people are, including testimony. And, you know, plaintiff's brief is quite hyperbolic and not accurate on these issues. There isn't testimony that you can identify from the database who received the facts. There isn't testimony that every dealer in the database at a given time received the facts. That testimony doesn't exist. And I will, again, defer to Credit Smarts. It's their database in terms of the facts. They're far more able to address the intricacies. I'm happy to talk about them. I have reviewed the record. The court made findings. The first finding was that you can't determine from the database who got the facts. And this goes back to class certification generally, which is the burden is on the plaintiff, which is a burden that has been reemphasized and reemphasized by the Supreme Court time and time again. May I ask you, what's the purpose of this database? I'm sorry, what is the purpose? What's the purpose of this database? Can I address that, Your Honor? Go ahead. The testimony of Credit Smarts was that the purpose was a general purpose, as all databases are, to perform administrative, regulatory, marketing, and other purposes. So it was just a standard run-of-the-mill database that had a whole bunch of people in it, local people, national people, industry people. Regulatory and marketing, which means that you want to keep it as a reference for other things down the road? No, not necessarily, Your Honor. Credit Smarts is a very small company, just a handful of employees. Well, if I were to look at it, what would it show? Would it show fax numbers? Sometimes. Of recipients of the faxes that were sent? No, sir. It would just show their fax number. It would show that a fax was sent to these individuals? No, sir. That's what I'm trying to communicate. The database would just show the name of the company, their address, telephone, and fax number, and there might be some notes in there that Sam runs this company, his wife is the secretary. And to what use is this database put? As you say, for marketing? Sometimes for marketing, sometimes for regulatory purposes if they have to make a filing, sometimes for reference to prior business that they've done together. But it would have contact information, wouldn't it? Name, address, phone number, sometimes fax number. If plaintiff would have had this information and sent to all the people on this database, did you receive a fax from this number in the year 2012, tell me yes or no, or send me an affidavit that you did, what would be the problem with that? Let me address that question. That doesn't satisfy the standard under the TCPA, is the simple point, which is there are defenses under the TCPA. It may not. I'm just trying to see what the threshold is. And one of my comments I was going to get to once we pass through the evidentiary point. I don't disagree with you. Is that, you know, we're having a theoretical discussion about identifying a class. One important point about this case is discovery is over. This is not a typical class certification situation in which class certification is sort of front loaded in the case, and then the case gets litigated. Discovery is completed in this case. So the plaintiffs have taken all the discovery they think they need. It is closed. Yeah, but why are we considering defenses at this stage? Because we have the right to defend ourselves. It's a due process right, and there are elements to this case independent of ascertainability. You can file a motion to dismiss. But the fact of the matter is the questioning has been focused on the notion that if we just had this list, if we just had this list, somehow we'd know who there was liability to. That isn't the case. There are inquiries in a TCPA case, and in this case, that go far beyond are you a name on a list. So the question is would we know who received the facts? We've already talked at length about we wouldn't know from the database. Well, this case was doomed on the ascertainability standard, and that's why we're focusing on that. Understood, Your Honor, but there are still other issues. I mean, even if someone received the facts, there are multiple individual issues in this case. There may be, but is that really for us to resolve today or to leave those in the first instance for the district court if we think the district court erred on ascertainability? They absolutely could be left for the district court. They have to be left to the district court. And they presumably have to be left, but the point is going to this inquiry in the first instance, many of the questions have had the sense to them in the way Mr. Bach has presented his argument as if, well, if you get the list, there's liability. That is not the case. There would still be individual issues here. No, I think you'd think. That would doom certification. No, I don't think he was saying that. I think he was saying there's a next step that could be satisfied with claims forms and affidavits. And the question is whether the combination of a data list, which we certainly have never seen, but there's a representation that it gets us by the first step, then the issue is would the affidavits be sufficient even with that? I thought that's what we were arguing. Well, a claim form assumes the case is over. And we all come, I mean, I will confess, most of these cases are settled, and so we tend sometimes to look at the cases through the lens of a settlement process where there's a simple claim form. This isn't a claim form situation. This isn't a simple affidavit situation. This is a testing of liability situation, and defendant has a due process right to have liability tested. Well, that's a preponderance issue. It is. I'm sorry, it's a predominance issue in a class action determination. That is correct. And certainly the case could be remanded to have findings on all of the other elements of Rule 23. I wanted to respond to a few of the other questions that have been raised by the court. Before we leave this topic, I just want to come back because, as Judge Suria said, we take the point that an affidavit alone would not be sufficient under our case law, and we've addressed that. But here what we face is a combination of an affidavit and a database, and so the question really goes to, given how the class is defined, is there sufficient information on that database to provide some reliability to satisfy the objective criteria and the administratively feasible and reliable prongs of ascertainability? Why don't we have that in that, given that they've limited the class to those who appear on the 2014 database and where the entry was entered in or before 2012, and it has a fax number in that 2014 database? So they've narrowed the class to that group, and then over and above that, they've suggested that they're going to send out notice and affidavits, which would even, one would think, would even further narrow the class. If it's sent to just that group, those who responded would be an even smaller subset of that saying, yes, we received the fax. Why doesn't that satisfy ascertainability? Because the database, as we understand it, does not reflect who received the faxes in 2012. But why give you an inference, a reasonable inference that it does, given that we have testimony from the CEO and from Gomez that this is a program update or it looks like a program update, and that what a program update was is something that was sent to the full database, as well as that email a few months after the fax indicating that that's what happened here. Your Honor, I believe the evidence is disputed with respect to that, and Counsel for Credit Smarts addressed that issue. The court did look at the evidence and made findings on this, but there are a few other points, which is you have to take it down to an even deeper level with respect to BMW, which is there's only one of the three faxes even potentially at issue with respect to BMW. We would submit that there are none of them because the faxes weren't authorized. But only one of the three faxes is even potentially at issue with respect to BMW, and this is by plaintiffs on admission, and that's the facsimile that was sent on December 27th of 2012. There is no way and there's no evidence to ascertain from the database to whom that particular fax was sent. So the issue becomes even more complicated as to the only fax that is relevant to BMW. Why is the relevance to BMW limited to December 22nd? Because prior to that, BMW was not aware of any facsimiles being sent by Credit Smarts. This is actually in the record. The email that's at issue is a December 10th, 2012 email. The two faxes that predated that, BMW had absolutely no knowledge of. Is that something that has to be decided when defining a class at the outset? As to BMW, it needs to be. Because BMW doesn't have liability with respect, even potentially with respect to the other two. Why isn't that a defense? Well, because it's still going to be unascertainable. I mean, it's the – and the process of an affidavit will have no reliability. Is the affidavit going to be check a box and tell us if you received a fax on December 27th? I haven't heard from plaintiffs what they're even proposing in a concrete way about what the screening process would even be and then how you go about testing consent on top of it with the opt-out order. What aspect of the test for ascertainability, as we've ever articulated, takes account of to which defendant liability might be imputed? We have no – because the class, as alleged, is against both defendants. The only fax as to which BMW is potentially liable by their own admission is the single fax. So the class would need to be redefined as to that one fax as to BMW only. Are you suggesting that there needs to be multiple class certifications or multiple class definitions given their origin case? Potentially, yes. Because BMW has no liability on any of them, but certainly on the first two, even by plaintiff's own admission. Ms. Strickland, you are aware there's a circuit split on the issue of ascertainability and the 6th, 7th, and 8th circuits don't have the same requirement that we have. Now, if you were in the 6th, 7th, or 8th circuit where ascertainability were not one of the factors that the district court would consider, is it fair to say that the plaintiff's case would march on forward? I would say that it would not. I would say that we would have gotten to predominance. Yes. I'm trying to get to that. Yeah. What other Mu23 factors do you believe would stand in the way of plaintiff's case? Multiple. If it weren't ascertainability. Your Honor, actually, let me just introduce this by saying I – And by the way, the district court did not address those factors, did it? Did not. And I probably have a somewhat unique view of the circuit split. I think there's a certain amount of the circuit split that boils down to timing rather than substance and the various rubrics under which you put these issues. The ascertainability requirement in this circuit, I believe, as the court has done in Carrera and Hayes and other cases, that that test is appropriately front-loaded, which is what this circuit has done. You think it's a close cousin of other Rule 23 cases? But I do think it's a very close cousin of predominance, manageability, and superiority, all of them. Because the fact of the matter is at the end of the day, class action jurisprudence and the notion of a class action is not meant to supplant the law on liability. And there's a lot of discussion in this courtroom today and elsewhere as if the class certification process is the end of the process. There's no question that class actions are intended to be an efficient way of adjudicating liability under appropriate circumstances, but they're not the end of the story. And it's still the case that every single member of the class should only be recovering if there's liability to that class member. But that can be done at the administrative juncture of the class action. But that's not really the way it works in the real world, and that's why I think the Third Circuit actually is correct in its prior holdings. I represent defendants, it's probably clear. But in the real world, the class certification decision exerts so much pressure on the process that it's very hard to get to the back end of the case and say, okay, we'll deal with this in an administrative matter. And I think where the Seventh Circuit and the Ninth Circuit really do have it wrong is they ignore the realities of the situation, which is we should decide in the beginning, is there a class? And then move on to is there a way to adjudicate liability, which is what the Third Circuit has done. And that recognizes both the efficiencies of the class mechanism, because this notion in the Seventh Circuit and now the Ninth Circuit, that first you litigate the case, and then you figure out at the end if you really should have had a class to begin with, is extraordinarily inefficient. It's very expensive for the parties, and perhaps of greatest interest to the court. It's a tremendous imposition on the court system. Those are thoughtful comments from me, but I don't know. But, I mean, it's a tremendous imposition to litigate a class action, to only be told at the end, okay, now let's have a decertification proceeding. Because you know all those things you said at the beginning about it not being manageable? You're right. It's not manageable. How are they ever going to try this case? Or how are we ever going to allocate damages? The interests you identify are important ones, but in the criticism that's been levied against this doctrine, it's focused on the second prong. Why aren't those interests satisfied simply by having some objective criteria at this very early threshold stage, and then leaving the questions about administrative feasibility of methodologies to a later stage? Because having objective criteria is wonderful in the Seventh Circuit, where they're highly intellectual, but it's not how it works in real life. You have to then take the objective criteria and apply them. Does that mean the Third Circuit is highly intellectual? The Third Circuit is highly intellectual too, but it's not the Chicago school. And there's a lot of deference to practicality in the Third Circuit's approach, and consistent with Rule 23 and what the Supreme Court is telling us, which is the burden is on the plaintiff. Class actions should not proceed unless there's a class. Let's test it at the beginning. We don't require objective proof. We require a reliable and administratively feasible way of determining the class, which is different. And the district court here seemed to focus on objective proof, which is not the standard that we apply. I'm not sure that in reality that's what the district court did. I mean, the district court's opinion is quite detailed on the facts and does go very deeply into whether the court felt there was an administratively feasible and reliable way to determine who potential class members are. That seems to be what the district court did. It looked at the document and said, this is not going to help you. This is not administrative feasible. I think it just may have pulled the trigger a little too quickly. Instead of showing it to the plaintiff and saying, all right, what are you going to make of this? Tell me how you're going to – how administrative feasibly you're going to determine the putative class member. The plaintiffs – I mean, that exchange did not take place. The district court just said, no, this is not going to help you. The plaintiffs had every opportunity to brief the issue, and discovery was closed, which I think is a very pertinent fact. It's not like the plaintiff was deprived of the opportunity to conduct discovery. But they did request the database, and that was denied. They eventually moved to compel, and that was denied. But that's the process. I mean, they had the opportunity. They litigated that issue. And the evidence is that the database doesn't include a class list. It's both over-inclusive and under-inclusive and not conclusive at all. Yeah, but when trial courts deny motions to compel of that sort, I mean, that's reviewable as well. It is reviewable. But it's also reviewable potentially from the trial court. Okay. I think my time has expired. I'm happy to respond to any other questions. Thank you. Thank you. We appreciate the input. May I say one thing? Very briefly, in less than 10 seconds. It's a bit unusual, but 10 seconds. Thank you. I just want to say very, very quickly that when the court, for purposes of argument, that makes this assumption that there's some evidence, record, log, database, that ascertains, identifies who the recipients were, when you look at the record and you study this, there simply isn't anything. We have the record, and we have reviewed that record. All right. Quickly, and we're about. Counsel said that it was a standard run-of-the-mill database, but the testimony is that it's not, that it's under lock and key. It's in some super safe security. The witness testified. Even President Obama couldn't get there. And the people, and it was put together through thousands of hours of people making phone calls. The whole business is to prepare this database. And we do have the pages for the plaintiff's participation in the database, and it does say the date that it was initiated and the date it was updated. And some of these, there's a whole bunch of fields. That's the only ones we did get. We did request it, DOC request number 19 in 2014. They responded by saying there's no such database. We do have a database, but it's live and it's modified and it's secret. And then we moved to COMPEL eventually, and that was denied. Counsel said that, you know, the danger here is you certify the class and everybody wastes a whole bunch of time and we never resolve anything. I've been doing TCPA cases a long time. I've never had one decertified. We have had summary judgments granted. Holtzman v. Terza was a summary judgment affirmed by the Seventh Circuit. We have had bench trials. We've had jury trials. But the case starts because some guy in a room sends 20,000 faxes by pushing a few buttons to a list, one document to a list, and then the case becomes a big mystery and how could we ever? It's so complicated, how would we ever know? But he was able to send a fax to everybody at the same time. There's no dispute that nobody in that list had given permission to get a fax of BMW's stuff advertising. We don't have everybody at the same time. We do have three different tranches. How do you respond to the point that BMW's counsel has made that we ought to think differently about the class in relation to BMW than ascertainability of the class as a general matter? I heard that, but I disagree. The plaintiff never said that there's one fax sent in three waves over a six-week period. So we don't admit that only one of those is relevant to BMW. What we did was we said, BMW says, well, we didn't send that. And we said, well, here's your person new before the third broadcast. Your people have seen it and didn't even object. They didn't have any problem with this. But the regulation, the FCC's regulation, says that a person can be liable if a fax is sent on their behalf or if it advertises their stuff. And this fax advertised only BMW's goods, only their services. And so a fax sent advertising BMW's stuff triggers the statute and its liability. You said you handled several of these cases in other jurisdictions? Yes. So you have an idea what this document looks like? This database? Yes. Only because we've seen the plaintiff's... It's their proprietary database that they put together. So it's just a big spreadsheet, basically, of information that people gathered through telephone calls. But I understand the customer lists or that sort of thing are proprietary and valuable so they don't turn them over. Well, the district court got a look at it. I guess. So the district court said there's no evidence that the fax was sent to everybody in the database. And that's what counsel keeps saying is that there's nothing in the database that says, yes, each person got a fax. But we know that the fax was only sent to the database. The judge said there's no evidence. And I think what the judge meant was there's no direct evidence because there is indirect evidence. Your Honor pointed out circumstantial evidence. I mean, there's only evidence that it was sent to the database. There's no evidence to the contrary. The defendant admitted there was no other list. Nobody says they sent it to anybody but the people in the database. What do you identify as the universe of that evidence, your best evidence that you point us to in the record that gives rise to that inference? Ryan's testimony and Gomez's testimony. Gomez is the person who sent the faxes. And this lawsuit wasn't two years after the faxes. The faxes were in November and December. We filed the case in, like, August of 2013, eight months later. Gomez doesn't have a recollection. Yeah, Gomez just barely remembers his name. And the CEO was not a firsthand witness, was not involved in the transmission. So what can we take from that to be assured that the database provides a level of objectivity and reliability that would give otherwise insufficient affidavits sufficient standing to answer ascertainability? Your Honor, I think I understand the question. There is a lot of evidence, testimonial evidence, that it's a business record, that the record was created and maintained and preserved and protected. And Ryan testifies what he knows based on asking his employee, tell me everything that happened. This is a big deal. BMW is a big customer. I want to know what's going on. And the guy tells him. When we ask the guy, he doesn't remember anything. But we do have Ryan's testimony that it's a program update, that it was sent to the database, that they're sent to the database. He didn't do it. He doesn't know exactly who did it or how it was done, other than he knows that Gomez told him he did it. And when he asked about it, Gomez sent him a copy of the facts. Here's what was sent. I'm sorry. Well, your time is up. We appreciate the very helpful argument on both sides. An excellent advocacy by both counsel. And in view of that, we would appreciate the preparation of a transcript with the cost to be shared by the parties. We will put that order out afterwards, and we will take the case under advisement.